Roberto Hernandez MIRANDA,
Plaintiff–Appellant,

v.

CLARK COUNTY, NEVADA; Morgan
Harris; Thomas Rigsby,
Defendants–Appellees.

No. 00–15734.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 19, 2002.

Filed Feb. 3, 2003.

Roy A. Jacobson, Jr., Jackson, WY, for the plaintiff-appellant.

J. Douglas McCalla, Spence, Moriarity & Schuster, Jackson, WY, for the plaintiff-appellant.

Thomas D. Beatty, Law Offices of Thomas D. Beatty, Las Vegas, NV, for the defendants-appellees.

Gloria J. Sturman, Edwards, Hale, Sturman, Atkin & Cushing, Ltd., Las Vegas, NV, for the defendants-appellees.

Janson F. Stewart, Chief Deputy District Attorney, Las Vegas, NV, for the defendants-appellees.

Before: SCHROEDER, Chief Judge, SNEED, PREGERSON, REINHARDT, T.G. NELSON, KLEINFELD, HAWKINS, THOMAS, SILVERMAN, WARDLAW and BERZON, Circuit Judges.

Opinion by Chief Judge SCHROEDER; Partial Concurrence and Partial Dissent by Judge KLEINFELD; Partial Concurrence and Partial Dissent by Judge SILVERMAN.

SCHROEDER, Chief Judge.

We took this case en banc to consider whether the head of a county public defender's office, as the administrative head of an organization formed to represent criminal defendants, may be held accountable under 42 U.S.C. § 1983 for a policy that leads to a denial of an individual's right to effective representation of counsel. We take principal guidance from the leading Supreme Court decisions on state and municipal liability, *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), as well as the leading decision considering § 1983 liability of a public defender, *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

*Polk County* held that when an assistant public defender is performing the traditional role of an attorney for a client, the lawyer is not a state actor. *Id.* at 318–19, 102 S.Ct. 445. The case left open the possibility, however, that there may be

liability for "administrative and possibly investigative functions." *Id.* at 324–25, 102 S.Ct. 445.

The plaintiff in this case is Roberto Hernandez Miranda. He was convicted of capital murder and served fourteen years in prison until a Nevada state court overturned his conviction in collateral-review proceedings. The Nevada court held that he was not provided effective assistance of counsel because the assistant public defender failed to investigate the case. The state declined to reprosecute.

Miranda then filed this action in federal district court against the individual assistant public defender who had represented him, Thomas Rigsby; the head of the Clark County Public Defender's Office, Morgan Harris; and Clark County, Nevada. The district court dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted.

According to the complaint, Miranda truthfully maintained his innocence, and he provided Rigsby with a list of forty witnesses who could provide information on who actually committed the crime. Rigsby, fresh out of law school and an assistant public defender for a little over a year, had never tried a murder case, much less a capital case. He interviewed only three of the witnesses Miranda had listed and subpoenaed none for trial. Miranda alleges conduct that fell far short of the minimal requirements of effective representation.

In addition, the complaint alleges Rigsby's representation of Miranda was doomed to failure because of two policies promulgated by Harris as the head of the Office of Public Defender. The first was a policy of administering a lie detector test to all defendants and allocating minimal resources for preparation of defense to those clients who appear guilty because they failed the polygraph. The plaintiff claims that this policy violates the basic dictates of *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), to provide all defendants with effective counsel regardless of guilt or innocence. *Id.* at 344–45, 83 S.Ct. 792. The second policy was to assign the least-experienced lawyers on the staff to capital cases without training or experience in the special demands of such cases. Plaintiff maintains that such a policy constitutes a lack of training so severe as to establish a "deliberate indifference" to a defendant's constitutional rights. *City of Canton,* 489 U.S. at 388–89, 109 S.Ct. 1197. Plaintiff alleges that Harris, as a policymaker for the county, made a deliberate choice to follow this course of action rather than to implement an alternative policy, and that the county thus violated Miranda's constitutional rights. *Id.*

Thus, contrary to the suggestions of my dissenting colleagues, the complaint effectively alleges that Harris made no particularized decisions through the exercise of independent professional judgment in the defense of a client. The complaint expressly states that "Harris, as a policy maker[ ] for the Clark County Public Defender's Office and Clark County, Nevada, ... allocate[d] investigative and defense resources based upon a defendant's performance on a polygraph examination" [Complaint ¶ 121] and "assign[ed] inexperienced and untrained attorneys to capital and other felony cases [Complaint ¶ 138]," which policy, custom or practice "was ... deliberately indifferent to, ... and in callous disregard for, Mr. Miranda's federal constitutional rights, including, but not limited to, his rights to the effective assistance of counsel." Complaint ¶ 138; *see also id.* ¶ 121.

The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) as failing to state a claim

upon which relief could be granted against any of the defendants. A three-judge panel of this court affirmed. *Miranda v. Clark County*, 279 F.3d 1102, 1112 (9th Cir.2002). We affirm as to Rigsby and reverse as to Harris and Clark County.

■ Key to our review is the stricture that when reviewing a dismissal of a complaint under Rule 12(b)(6), all allegations are to be considered in a light most favorable to the plaintiff. Gone is any heightened pleading requirement that may have influenced the district court's disposition of the case. *Leatherman v. Tarrant County NICU*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1121(9th Cir.2002). We therefore consider the allegations of the complaint as they relate first to the conduct of the individual assistant public defender representing Miranda, and then as they relate to the Public Defender, Harris, alleged to be the policy-maker for Clark County in the allocation of public resources for criminal defense.

### The Claim Against the Assistant Public Defender

■ According to the allegations of the complaint, the conduct of Rigsby was well below the accepted standard of representation of a capital defendant. Given a client who had pled innocent and provided the names of dozens of witnesses who could provide information about the client's innocence and the guilt of the actual perpetrator, the lawyer did essentially nothing. He subpoenaed no witnesses and mounted no defense. We assume, for purposes of this case, his conduct was deficient and to the detriment of his client.

The issue before us, however, is whether in providing inadequate representation to this defendant, Rigsby was acting on behalf of the Clark County government, so as to become a state actor within the meaning of § 1983. He was, no doubt, paid by government funds and hired by a government agency. Nevertheless, his function was to represent his client, not the interests of the state or county. The result reached by both the district court and the three-judge panel in this case, in holding he was not a state actor, is required by the Supreme Court's decision in *Polk County*. Rigsby had assumed his role as counsel and thus had begun to perform a "lawyer's traditional functions." *Polk County*, 454 U.S. at 325, 102 S.Ct. 445. The Court in *Polk County* found that a public defender representing a client in the lawyer's traditional adversarial role was not a state actor. *Id.* The Court did not predicate its holding on whether the lawyer was in fact exercising "independent judgment." *Id.* at 324–25, 102 S.Ct. 445. Rather, it emphasized that it is the traditional lawyer role that controls. *Id.* at 322 n. 13, 324 n. 17, 325, 102 S.Ct. 445; *Georgia v. McCollum*, 505 U.S. 42, 54, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (holding that it is the "nature and context of the function" that is determinative).

It does not matter that Rigsby was employed by a public agency. "Except for the source of payment, ... the duties and obligations are the same whether [Rigsby was] privately retained, appointed, or serving in a legal aid or defender program." *Polk County*, 454 U.S. at 318, 102 S.Ct. 445(internal quotation marks and citation omitted). In that traditional role, Rigsby was acting under the ethical standards of a lawyer-client relationship. He was "[h]eld to the same standards of competence and integrity as a private lawyer." *Id.* at 321, 102 S.Ct. 445. We therefore affirm the district court's dismissal of the complaint against the Assistant Public Defender, Rigsby, on the ground that, as a matter of law, he was not a state actor.

### The Claim Against Harris, the County Public Defender

The situation with respect to Harris, the administrative head of the County Public Defender's Office, is different. Insofar as this case is concerned, he was not acting under any of the ethical standards of the lawyer-client relationship to which Rigsby was bound. The nature and context of Harris's function was administrative. He was, according to the complaint, acting solely as the administrative head of the agency, responsible for allocating the office's finite resources. Also according to the complaint, he instituted certain policies as part of his administrative functions that resulted in the miscarriage of justice represented by the plaintiff's death sentence and murder conviction. We deal with each of these policies in turn.

### The Polygraph Policy

 The policy in question, for purposes of this appeal, is an alleged policy that subjected each client to a polygraph test and then allocated the resources of the office according to the result of that test. According to the complaint, "if a client failed a polygraph examination, as determined by the subjective assessment of the polygraph examiner, minimal investigation would be conducted and a limited defense would be provided." Thus, if a client appeared on the basis of a polygraph to be lying about his innocence, he would be provided minimal resources to develop a defense. Construed in a light most favorable to the plaintiff, this allegation means that those clients who claimed innocence, but appeared to be guilty, were provided inadequate resources to mount an effective defense.

In evaluating the viability of the claim, we first must determine whether Harris's implementation of such a standard constitutes state action for purposes of § 1983.

As we have seen, Rigsby, in undertaking the actual defense of Miranda, entered into an attorney-client relationship that placed him in a role that exempts him from liability under § 1983 as a state actor. Harris, however, is alleged to have been acting as the administrative head of the office in determining how the resources of Clark County would be distributed.

In allocating the county's funds, Harris was performing essentially an administrative role on behalf of Clark County. It was a function similar to that performed by the head of every government administrative office. *See, e.g.,* Nev.Rev.Stat. chs. 180.080, 260.010,-.040,-.070,-.075 (requiring of state and county public defenders expenditure reports and providing for institution and regulation of public defender offices). It therefore materially differs from the relationship inherent in a public defender's representation of an individual client. *Polk County,* 454 U.S. at 322 n. 13, 324–25, 102 S.Ct. 445. The conduct alleged falls within the type of administrative action adumbrated by the Supreme Court in *Polk County,* when it recognized the possibility that a public defender's "administrative and possibly investigative functions" would constitute state action. *Id.* at 325, 102 S.Ct. 445; *see also McCollum,* 505 U.S. at 54, 112 S.Ct. 2348 (reaffirming that the Public Defender may be a state actor with respect to administrative or investigatory functions). We thus conclude that Harris was acting on behalf of Clark County in determining how the overall resources of the office were to be spent, and he qualifies as a state actor for purposes of § 1983.

That conclusion also is mandated by principles enunciated in *Monell,* in which the Court held that counties and municipalities are amenable to § 1983 liability for constitutional deprivations resulting from application of governmental custom or pol-

icy. The resource allocation policy alleged in this case constitutes a viable claim and subjects Harris to suit as a policymaker on behalf of Clark County. *Monell*, 436 U.S. at 690–91, 694, 98 S.Ct. 2018.

■ The remaining question is whether the alleged policy resulted in deprivation of the plaintiff's constitutional rights to effective representation of counsel. That constitutional guarantee is of effective representation of all defendants, regardless of guilt or innocence. *See Gideon*, 372 U.S. at 344, 83 S.Ct. 792; *see also Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Here, according to the plaintiff, if the criminal defendant appeared on the basis of the polygraph test to be guilty, the office sharply curtailed the quality of the representation by limiting the investigatory and legal resources provided. The policy, while falling short of complete denial of counsel, is a policy of deliberate indifference to the requirement that every criminal defendant receive adequate representation, regardless of innocence or guilt. *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197. This is a core guarantee of the Sixth Amendment and a right so fundamental that any contrary policy erodes the principles of liberty and justice that underpin our civil rights. *Gideon*, 372 U.S. at 340–41, 344, 83 S.Ct. 792; *Powell v. Alabama*, 287 U.S. 45, 67–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *see also Alabama v. Shelton*, 535 U.S. 654, 122 S.Ct. 1764, 1767, 152 L.Ed.2d 888 (2002).

We recognize, of course, that allocation of resources must be made upon some criteria and not all result in denial of effective representation. We hold only that the determination cannot be based solely or even principally on polygraph results. In so holding, we express no opinion on whether the result of a polygraph test may be used as one of a number of factors employed in determining the extent of in-

vestigative resources to devote to a particular defendant's case. We hold only that polygraph results cannot be determinative.

The state suggests that there was no actual prejudice to Miranda in the representation because a Nevada court did not overturn the conviction until fourteen years after the conviction. The state further suggests that it was the death of witnesses rather than the weakness of the state's case in the first place that caused it to decline to reprosecute. These are factual issues, however, that are beyond the purview of our review on a Rule 12(b)(6) dismissal, where only the allegations of the complaint are relevant.

■ We recognize that the result reached by the district court in dismissing the complaint was in part dictated by heightened pleading standards that are no longer applicable. In *Branch v. Tunnell*, 14 F.3d 449, 455 (9th Cir.1994), we ruled such standards may apply after the Supreme Court's decision in *Leatherman v. Tarrant County NICU*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). However, we recently held that intervening Supreme Court authority has overruled *Branch. See Crawford–El v. Britton*, 523 U.S. 574, 595, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). We have now held that no heightened pleading standard applies unless required by the Federal Rules of Civil Procedure. *Galbraith*, 307 F.3d at 1124–25.

Under the standard that now applies, the complaint states claims against Harris and the County for the policy of allocating resources on the basis of apparent guilt or innocence. The Rule 12(b)(6) dismissal was inappropriate.

*Policy of Assigning Inexperienced Attorneys*

██ The complaint alleges that the County also had a policy of assigning the least-experienced attorneys to capital cases without providing any training, thus demonstrating callous indifference to the defendant's constitutional rights. The County responds that there was no callous disregard of constitutional rights within the meaning of *City of Canton,* because, as a matter of law, attorneys who have graduated from law school and passed the bar should be considered adequately trained to handle capital murder cases.

In *City of Canton,* the Supreme Court held that a failure to train subordinates may result in § 1983 liability where the failure amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact. *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197. The district court found the allegations of the complaint insufficient under the heightened pleading standard then in effect, relying on *Jones v. Community Redevelopment Agency,* 733 F.2d 646, 649 (9th Cir.1984). The panel essentially applied a similar standard by holding that the assignment of Rigsby to this particular case did not evince a policy of deliberate indifference. *Miranda,* 279 F.3d at 1111. The complaint, however, construed liberally, alleges not merely an isolated assignment of an inexperienced lawyer, but a deliberate pattern and policy of refusing to train lawyers for capital cases known to the county administrators to exert unusual demands on attorneys. Under pleading standards now applicable, *see Galbraith,* 307 F.3d at 1125, the allegations are sufficient to create a claim of "deliberate indifference to constitutional rights" in the failure to train

lawyers to represent clients accused of capital offenses.

The judgment of the district court dismissing the complaint against Rigsby is AFFIRMED. The judgment in favor of defendants Harris and Clark County is REVERSED and the case is REMANDED to the district court for further proceedings. Each party is to bear its own costs.

KLEINFELD, Circuit Judge, concurring in part and dissenting in part, in which SILVERMAN, Circuit Judge, joins as to Part II:

I concur in the majority's conclusion that the district court correctly dismissed Miranda's section 1983 claim against the assistant public defender, Thomas Rigsby, who represented him. In *Polk County v. Dodson,*[1] the Supreme Court held that because an assistant public defender's relationship to his client is substantially identical to a private defense lawyer's, except for how he gets paid, his malpractice, if any, may subject him to a state law malpractice action but is not state action for purposes of section 1983 liability.[2]

I.

I dissent, and would affirm the district court dismissal, as to Morgan Harris, the head of the county public defender's office. The majority ruling does not accurately state what the complaint, upon which this 12(b)(6) ruling must be based, actually says. According to the majority, Miranda pleaded that if a client "appeared on the basis of a polygraph to be lying about his innocence, he would be provided minimal resources."[3] Thus "those clients who

---

1. *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

2. *Id.* at 325–26, 102 S.Ct. 445.

3. Maj. Op. at 469.

claimed innocence, but appeared to be guilty, were provided inadequate resources." [4] And "according to the plaintiff, if the criminal defendant appeared on the basis of the polygraph test to be guilty, the office sharply curtailed the quality of representation." [5]

Actually the complaint does not say or imply any of these things. It says "polygraph examinations were administered to defendants to determine the investigative and defense resources that would be allocated to their case," and that if they failed, minimal resources would be allocated to the case. [6] It goes on to allege Miranda received a "substandard" defense "as a consequence of the Clark County Public Defender's policy of allocating investigative and defense resources based on the client's performance on the polygraph examination." [7]

The majority opinion assumes that Harris used the polygraph to sort out the innocent from the guilty and allocate the most resources to the innocent. No doubt the lawyers in the office tried their hardest for those clients they thought to be truly innocent, but there's no reason to suppose that the polygraph was used to sort out the innocent from the guilty. The complaint doesn't say that. The only mention of guilt is a letter that Rigsby, not Harris, wrote to his investigator, saying that "with such strong evidence of guilt and deception" he would ordinarily require little of the investigator. [8]

Maybe to those who haven't done any criminal defense, it isn't obvious why a polygraph examination would be used except to sort the innocent from the guilty. But to an experienced criminal defense lawyer, the distinction between lying and telling the truth is altogether different from (and much more important than) the distinction between guilt and innocence. If the police, prosecutors, and grand jury are doing their screening jobs well, the public defender should have few innocent clients. A criminal defense lawyer occasionally must defend the innocent, a fearfully grave responsibility, but more often defends the guilty. In defending the guilty, criminal defense lawyers perform two noble and just functions: they protect our society from unconstitutional excesses, and they protect criminals from judgments and sentences in excess of what their crimes deserve and ordinarily and properly receive under the law.

The biggest problem criminal defense lawyers face is that their clients often lie to them. Criminal defense clients lie a great deal to their lawyers, they lie to their lawyers more than they lie to the police, they lie about things that don't matter, they lie about things that matter tremendously, they lie in ways that hurt their cases, and most importantly, they lie in ways that disable their lawyers from defending them successfully. Frequently, criminal defendants tell their lawyers some ridiculous fairy tale, even though they have truthfully admitted most or all of what is at issue to the police. It is very difficult for a lawyer to prepare a good defense or negotiate effectively for a plea agreement when the client lies to the lawyer. The polygraph is a high-tech way to scare some of the clients into telling their lawyers the truth, and identifying other clients who won't.

**4.** *Id.* at 469–470.

**5.** *Id.* at 470.

**6.** *See* Complaint at ¶ 117.

**7.** *Id.* at ¶ 120.

**8.** *Id.* at ¶ 118.

The problem with the lying client isn't that he's guilty. One hopes, if one does criminal defense, that most clients are guilty, because of the terrible risk of an innocent person being convicted. The problem is that the lying client wastes the lawyer's time and his office's resources with a whole lot of rabbit tracks that consume scarce investigative and legal resources but don't lead anywhere. The majority opinion, by carelessly reading into the complaint what isn't there, overlooks what is there. Miranda accuses Harris of using the polygraph to sort out which clients get more resources allocated to them due to a perception of truthfulness, not because the polygraph indicates guilt.

It may or may not be a good idea to use the polygraph this way. But it is a lawyer's decision—a decision that all criminal defense attorneys make in some form or another. Despite the administrative ring of "allocating resources" this is not an administrative decision like hiring or firing. *Branti v. Finkel,*[9] the Supreme Court decision subjecting chief public defenders to section 1983 liability in some cases, dealt with a public defender who fired all assistants who, though doing satisfactory work, were Republicans. The Court held that Republican Party affiliation had nothing to do with an assistant public defender's responsibility, "to represent individual citizens in controversy with the State."[10] Because firing Republicans was administrative and was not analogous to what a private lawyer would do in the course of criminal defense work, it amounted to state action.

Unlike firing a public defender due to his party affiliation, sorting out which clients are telling their lawyers the truth, to decide which ones get more attention and which investigative leads deserve more resources, is necessary to effectively represent them. Few things are more central to representing criminal defendants than persuading them to tell their lawyers the truth. Every criminal defense lawyer develops routines, scripts, and props, to convince his clients to move away from the lies they ordinarily tell at the first interview toward the truth. Some traditional routines are "why are you telling me that you weren't even there when you told the police that you were," and "if you lie to me and I get caught with my pants down in front of the jury, you go to jail, not me." The polygraph technique adopted by this public defender's office, was, so far as the complaint indicates, just such a prop. As such, it falls within the "exercising her independent professional judgment" for which *Polk County* holds that section 1983 liability may not lie,[11] as opposed to such administrative decisions as hiring and firing, which *Branti* holds that it may.[12]

It should also be noted that the complaint nowhere alleges that Harris had a policy of providing lying clients with "ineffective assistance of counsel." The policy as alleged is for providing "minimal investigation" and a "limited defense" due to a polygraph.[13] The 52–page complaint is drafted by able counsel and no doubt would allege a policy of providing ineffective assistance if, within the bounds of Rule 11, it could. But it doesn't. The constitutional floor is not massive or sub-

**9.** 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**10.** *Id.* at 519, 100 S.Ct. 1287.

**11.** *Polk County,* 454 U.S. at 324–25, 102 S.Ct. 445.

**12.** *Branti,* 445 U.S. at 517–19, 100 S.Ct. 1287.

**13.** Complaint at ¶ 117.

stantial resources, it's effective assistance of counsel, which may or may not correlate with minimal resources. If Harris saw to it that sufficient resources were available to assistants to provide effective assistance of counsel, then minimal resources consistent with that floor would not be unconstitutional. The complaint does not plead that resources for clients who failed the polygraph were inadequate to provide effective assistance of counsel. It does plead that the investigation was "inadequate" and that the defense was "substandard" as a consequence of the polygraph use,[14] but does not use the words of the constitutional formula. The only reasonable inference from the nonuse of the necessary words is that they could not be honestly said.

## II.

Finally, I also dissent from the majority's reversal of the district court dismissal of the claim against the County for the lawyer assignment policy. The County doesn't have anything to do with assigning work to public defenders and doesn't have anything to do with training or licensing lawyers. The Supreme Court held in *City of Canton, Ohio v. Harris*[15] that "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983."[16] A municipal policy or practice such as inadequate police training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the

rights of persons with whom the police come into contact."[17]

The majority opinion says that "[t]he complaint alleges that the County also had a policy of assigning the least experienced attorneys to capital cases without providing any training."[18] Actually, the complaint doesn't allege that. It says that "[t]he Clark County Public defender's office" had such a policy or practice, which was "established by Morgan Harris" and John Does.[19] There's a big difference, because a senior or supervising attorney's assignment of cases and work within cases to junior lawyers within the office is quintessentially part of his legal representation. Our law clerks will soon be going to work in law firms in which partners, with little or no consultation with their clients, will assign critical work on important cases to them, and the partners will properly regard their assignment and supervision of green associates' work as legal work for which they will bill, as opposed to administrative work, such as hiring new lawyers, for which they will not. There is no reason to think that the Clark County Board of Commissioners, as opposed to the county public defender, has any policy, or is allowed any say, as to which lawyers handle which cases in the public defender's office. The complaint doesn't allege it.

Nor does the complaint allege that the county assigned inexperienced lawyers to try murder cases without assistance. The complaint says that another lawyer, Douglas DeJulio, "assisted Mr. Rigsby at trial, but was not involved in the pretrial investi-

---

14. *Id.* at ¶ 120.

15. 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

16. *Id.* at 385, 109 S.Ct. 1197(citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S.

658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

17. *Id.* at 388, 109 S.Ct. 1197.

18. Maj. Op. at 471.

19. Complaint at ¶¶ 134, 138.

gation or preparation." [20] The complaint doesn't allege any deficiencies in Mr. De-Julio's experience, education, training, and ability. Miranda actually pled that the public defender had a policy of using a lawyer with a year and a half of experience to prepare the case, but rather than send him into the courtroom alone, the office policy provided for experienced counsel to backup the green lawyer and give advice at trial.

Why does the majority claim that this policy by Harris, the county public defender, is "deliberate indifference" to defendants' rights to competent counsel by the County? I don't know, because the opinion doesn't say. The closest it comes to an argument is saying that the County assigned lawyers "without providing any training." [21] I can't make any sense of this. Since when do lawyers get their training from counties? Most of us get our training from accredited law schools. Is the majority suggesting that it is unconstitutional for governments that provide public defenders not to provide them with free continuing legal education? Who knows? So radical a suggestion would require some explanation, and the majority opinion doesn't contain any.

The majority suggests, without troubling to construct an argument, that this case is like *City of Canton*, where the Supreme Court held that a policy of failing to give emergency medical training to police officers could amount to deliberate indifference toward arrestees' rights to emergency medical training. [22] But the case at bar

doesn't involve training police; there's no analogy. If municipalities hire inexperienced police and don't provide any training, the police may not get any, except as their experience over the years gives it to them, so one would have to expect grave mistakes in their early years. Police don't necessarily go to police school before getting hired as police. But lawyers do necessarily go to law school (or in some states read law under supervision) before being hired as lawyers. In Nevada, the Board of Governors of the state bar, not counties, determines whom to admit to the practice of law, [23] and the educational requirement to practice law is graduation from a law school accredited by the American Bar Association. [24] Unless the majority opinion means to suggest that the Nevada Supreme Court Rules governing the practice of law are unconstitutional because they allow admitted lawyers to represent clients in any sort of case with no more than the training required by the rules, there is no basis for its reversal of the district court dismissal of the claim against the County.

The majority's reliance on the County's assignment of an inexperienced lawyer and policy of refusing to train lawyers is also surprising in light of the Supreme Court's holding in *United States v. Cronic* [25] that ineffective assistance cannot be inferred from assignment of a young inexperienced lawyer to a major felony case, even though he had no criminal experience and had never tried a case to a jury. [26] Similarly, we held in a death penalty case, *Ortiz v.*

---

**20.** Complaint at ¶ 31.

**21.** Maj. Op. at 471.

**22.** 489 U.S. at 388, 109 S.Ct. 1197.

**23.** NV S.Ct. Rule 49, n. 1, *available at* http://www.leg.state.nv.us/ CourtRules/SCR.html (last visited Dec. 16, 2002).

**24.** *Id.* at Rule 51, n. 3.

**25.** 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

**26.** *Id.* at 665, 104 S.Ct. 2039.

*Stewart,*[27] that assigning a green lawyer did not, under *Cronic,* constitute ineffective assistance of counsel. We held the same in *LaGrand v. Stewart,*[28] another death penalty case, because "it is not the experience of the attorney that is evaluated, but rather, his performance."[29] It does not make sense, in the face of established law holding that assignment to inexperienced counsel with no special training does not support an inference of ineffective assistance even in death penalty cases, for the majority to infer such assignments, made as a matter of policy, do support such an inference. If there were some logic to having it both ways, it would be incumbent on the majority to set it out and distinguish the cases. The sounder position is the one the district court adopted, that the complaint does not state a cause of action against the County.

The policies Harris, as County Public Defender, is alleged to have adopted—using polygraph examinations of clients to decide how extensively defense resources would be allocated to them and assigning young lawyers to work up murder cases for trial and to try them with experienced lawyers assisting them—may or may not be a good idea. But as the Court in *Cronic* said, "We do not pass on the wisdom or propriety of appointing inexperienced counsel in a case such as this," because "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled."[30] While these policies may or may not be wise, they are not unconstitutional.

Criminal defense lawyers ought to have their eyes on the jury. Heavy-handed regulation of public defenders' offices such as we engage in today forces them instead to be looking over their shoulders at us. They know better than we do how to defend all their clients.

SILVERMAN, Circuit Judge, with whom SNEED and T.G. NELSON, Circuit Judges, join, concurring in part and dissenting in part:

I agree with the majority that by virtue of *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509. (1981), the conduct of Assistant Public Defender Thomas Rigsby cannot be considered "state action" for § 1983 purposes. As I see it, however, this is also the case with Public Defender Morgan Harris. I would affirm the dismissal of the complaint against him as well.

I read *Polk County* to hold that a public defender—be it an assistant P.D. or the head of the office—does not act under color of state law when exercising independent professional judgment in connection with the defense of a client. *Id.* at 324–325, 102 S.Ct. 445. In my view, a decision by the public defender as to which of his or her assistants to assign to a particular client, in a particular case, is directly related to the defense of the client. Therefore, under the rationale of *Polk County,* it is not state action. The same goes for the use of a polygraph examination and other aspects of trial preparation. These are decisions pertaining to the client's representation, and consequently, are not made under color of state law. Such decisions are in contrast to, say, a public defender's discrimination in hiring, or sexual harassment of an employee—conduct having nothing to do with the defense of a client.

**27.** 149 F.3d 923, 933 (9th Cir.1998).

**28.** 133 F.3d 1253, 1275 (9th Cir.1998).

**29.** *Id.*

**30.** *Cronic,* 466 U.S. at 665 n. 38, 104 S.Ct. 2039.

Such non-case-related decisions are not protected by *Polk County.*

As for the claim against Clark County, I agree with Judge Kleinfeld and join that portion of his partial concurrence, partial dissent.